# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| DONNA HUDDLESTON, | : | Case No. 1:12 CV 0623 |
| Plaintiff, | : | |
| v. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | **MAGISTRATE'S REPORT AND** |
| | | **RECOMMENDATION** |
| Defendant. | : | |

## I. INTRODUCTION.

Pursuant to 28 U. S. C. § 636(c) and UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULE 72.2, this case was automatically referred to the undersigned Magistrate Judge for a Report and Recommendation.  Filed pursuant to 42 U. S. C. §§ 405(g), Plaintiff's complaint seeks judicial review of Defendant's final determination denying her claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*.  The issues before the Court are presented in cross-Briefs filed by the parties (Docket Nos. 14 & 15).  For the reasons that follow, the Magistrate Judge recommends that the Court affirm the Commissioner's decision.

## II. FACTUAL & PROCEDURAL BACKGROUNDS.

On January 7, 2008, Plaintiff filed two applications for benefits, one for SSI and the other for DIB.  Both applications alleged that Plaintiff became unable to work because of her disabling condition which began on December 31, 2004 (Docket No. 10, pp. 130-132; 133-135 of 483).  Both claims were denied initially and upon reconsideration (Docket No. 10, pp. 73-76; 77-80; 81-83; 85-87 of 483).  An administrative hearing was conducted on July 6, 2010, in Cleveland, Ohio, and on August 11, 2010, Administrative Law Judge (ALJ) Kendra S. Kleber determined that Plaintiff was neither entitled to a period of disability nor eligible for SSI (Docket No. 10, pp. 10-22, 23 of 483).  The Appeals Council denied Plaintiff's request for review on February 3, 2012 (Docket No. 10, pp. 5-7 of 483).

### A.  THE ADMINISTRATIVE HEARING.

At the administrative hearing, Plaintiff, represented by counsel, and Mark Anderson, a Vocational Expert (VE),  appeared and testified (Docket No. 10, pp. 23, 53 of 483).  **1** .

### PLAINTIFF'S TESTIMONY.

Plaintiff dropped out of school in the ninth grade.  At the time of hearing, Plaintiff  resided in a second floor apartment with her two minor children, ages 17 and 9.  Plaintiff had difficulty walking up and down  stairs; consequently, she only left the apartment about once weekly for a trip to the grocery store or for a medical appointment.  Plaintiff did not drive (Docket No. 10, pp. 30-31, 34-35, 45. 111 of 483).

### a.  EMPLOYMENT HISTORY.

Plaintiff was 40 years old at the time of the hearing and during her years of employment, she had held three positions that could be considered substantial gainful employment: work as a home

health aid, hand packager and laborer at a window factory.  More recently in January 2008, Plaintiff

was employed as a home health aid.  On an average, Plaintiff worked two or three days weekly.  Her

job duties included cooking, cleaning and assisting a patient who weighed 175 pounds get in and

out of the bathtub (Docket No. 10, pp. 32, 33, 55, 58-59, 111 of 483).

During two years of intermittent employment at Laich Industries, Plaintiff was a packer with

accommodations for lifting.  Plaintiff was discharged for failure to produce results and her excessive

absences (Docket No. 10, pp. 32-34 of 483).

**b.**   **IMPAIRMENTS**.

Plaintiff explained that she could no longer work because of six physiological and/or

psychological disorders or diseases that resulted in disability eligibility:

(1)     Anxiety/depression;
(2)     Back pain;
(3)     Diabetes;
(4)     Hypertension;
(5)     Leg pain and
(6)     Menorrhagia.

(1)  Plaintiff had been prescribed Xanax [XR®], a medication used to treat anxiety and panic

disorders, because her symptoms of depression had gotten progressively worse.  When exposed to

crowds, Plaintiff's reacted physically to the anxiety by sweating profusely, becoming nauseated and

showing signs of nervousness.  Therefore, her only social interaction was with her mother and

siblings although Plaintiff suffered from the emotional embarrassment of being unable to care for

her family and her other affairs particularly when her sister came three times weekly to assist with

the house work.  Further, bouts of anxiety and nervousness interfered with Plaintiff's ability to sleep

at night; consequently,  up to five hours were spent sleeping during waking hours. (Docket No. 10,

pp. 34, 35, 36, 50, 52 of 483; PHYSICIAN DESK REFERENCE (PDR), 2006 WL 384705 (Thomson PDR

2006)).

(2)  To treat back pain, Plaintiff was prescribed Lyrica®, a medication used to treat nerve

pain.  The side effect from taking this medication included elevated glucose levels (Docket No. 10,

p. 38 of 483; PDR, 2006 WL 384608 (Thomson PDR 2006)).  Through midyear in 2008, Plaintiff

underwent a series of epidural nerve blocks for pain.  The effectiveness of the injections was limited

to the time between injections.  Because the injections had limited overall effectiveness, Plaintiff

opted to undergo only two of the series.  Plaintiff was unable to engage in physical therapy since she

had no transportation to the facility.  In the alternative, Dr. Adel Zakari, an anesthesiologist, showed

her some home exercises that would assist with getting into the bathtub and performing other tasks

(Docket No. 10, pp. 39, 40 of 483; www.vitas.com/doctor/Dr_Adel_Zakari).

(3) Prescribed Glyburide and Metformin, medications used in combination to treat type two

diabetes, Plaintiff took the Metformin twice daily even though it caused chronic diarrhea.  Plaintiff's

appetite was adversely affected as a result of the diarrhea (Docket No. 10, pp. 38, 48, 49, 50 of 483;

www.drugs.com/pro/glyburide-and-metformin.html).

(4)  Plaintiff was prescribed Lopressor, a beta blocker used to regulate high blood pressure.

Apparently, she had spikes in her blood pressure levels and her blood pressure was controlled with

this medication (Docket No. 10, pp. 50, 51 of 483; www.drugs.com/pro/Lopressor.html).

(5)  Plaintiff fell and "smashed" the nerves in her leg.  As a result, Plaintiff frequently lost

her balance probably because of the pain that was shooting down the lower back of her leg.  Losing

her balance occurred one or twice a month (Docket No. 10, pp. 45, 46 of 483).

(6)  Having undergone endometrial ablation in 2008, Plaintiff took a diuretic and potassium

pill to provide some relief from excessive menstrual bleeding.  To relieve this symptom undoubtedly

4

caused by the presence of uterine fibroids, Plaintiff contemplated a hysterectomy. (Docket No. 10, pp. 37, 38, 43, 47, 51 of 483).

### c. RESIDUAL FUNCTIONAL CAPACITY.

Plaintiff explained that she had difficulty climbing stairs because it caused a tingling feeling in her legs that radiated to her chest. She generally had to rest on the landing and regroup when ascending the stairs. Descending the stairs was less difficult. Consequently she left her apartment only when necessary (Docket No. 10, p. 31 of 483).

### 2. THE VE'S TESTIMONY.

The VE, a board certified vocational expert, reviewed portions of the record that pertained to work history and analogized Plaintiff's jobs with entries in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), enough to produce a specific vocational preparation and exertional levels:

| JOB & DOT | EXERTIONAL LEVELS | SPECIFIC VOCATIONAL PREPARATION | SKILL LEVEL |
|---|---|---|---|
| Home health aide 354.377-014 | Medium work or work that involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. | 3--The amount of time that would lapse before the typical worker could learn to perform this job would be anything over one month up to and including three months. | Semiskilled work which needs some skills but does not require doing the more complex duties. |
| Hand packager DOT 920.587-018 | Medium work | 2--The amount of time that would lapse before the typical worker could learn to perform this job would include anything beyond a short demonstration up to an including one month. | Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. |
| Laborer DOT 865.684-014 | Medium work | 3 | Semiskilled work. |

(Docket No. 10, pp. 54-55 of 483).

5

Plaintiff clarified that she painted during her job at a window company. While employed full time at a plastics company, Plaintiff packed plastic "stuff" (Docket No. 10, p. 57 of 483).

In the *first hypothetical*, the ALJ asked the VE to assume that the hypothetical plaintiff had Plaintiff's vocational profile and residual functional capacity to perform medium work, limited to never climbing ladders or scaffolds and only stooping, crouching or crawling occasionally. The VE explained that this hypothetical plaintiff could perform the hand packager job as Plaintiff performed it and as DOT described it. She could not, however, perform the window and laborer jobs (Docket No. 10, pp. 59-60 of 483).

In the *second hypothetical*, the ALJ added that the hypothetical worker would be limited to simple tasks, occasional contact with the public and requiring low stress. The VE opined that this hypothetical plaintiff could perform the past job of hand packager. This job carried with it a temperament rating of R, which meant that it is simple to perform and it had a SVP of 2 which indicated that the job could be learned in less than 30 days (Docket No. 10, p. 60 of 483).

In response to the *third hypothetical* posed by counsel, the VE was asked to imagine an individual with serious limitations in the ability to function independently, appropriately and effectively on a sustained basis. The VE could not form a response because this vocational profile was not stated in terms recognizable by either the DOT or SELECTED CHARACTERISTICS [OF OCCUPATIONS], the companion volume to DOT (Docket No. 10, pp. 60, 61 of 483).

### III. THE MEDICAL EVIDENCE.

The cornerstone for the determination of disability under both Title II and Title XVI is the medical evidence. Each person who files a disability claim is responsible for providing medical evidence from sources who have treated or evaluated the claimant, determined that the impairment

6

exists and assessed the severity of that impairment.  20 C. F. R. § 404.1512((b), (c) (Thomson Reuters 2012).  A chronological review of Plaintiff's medical evidence, categorized by source, follows.

       **1.**      **IMPAIRMENTS BASED ON PHYSICAL EXAMINATION.**

       **A.**      **FAIRVIEW HOSPITAL, A CLEVELAND CLINIC HOSPITAL.**

From December 2005 through September 2008, Plaintiff presented to this hospital for her primary care.  During the course of ongoing treatment, Plaintiff underwent a pain management assessment at Westgate Medical Anesthesia Group.

Plaintiff fell on the ice and sustained an ankle/foot injury on December 19, 2005.  Diagnosed with a right ankle sprain, there was no evidence of fracture or dislocation (Docket No. 10, pp. 228, 230).

On March 7, 2006, Plaintiff presented for follow-up care on her ankle sprain.  A slight widening of the ankle mortise laterally was detected (Docket No. 10, p. 259 of 483).

Results from the diagnostic evaluation of the specimens taken from Plaintiff's cervix on June 28, 2006, were negative for cervical/endocervical intraepithelial lesion or malignancy (Docket No. 10, p. 257 of 483).

On January 8, 2007, Plaintiff underwent a procedure known as endometrial ablation or therapeutic selective endometrial destruction (Docket No. 10, p. 232 of 483; STEDMAN'S MEDICAL DICTIONARY 890, 27th ed. (200))).  Results from the hematological review showed elevated levels of red blood cells, red blood cell distribution width and mean platelet volume (Docket No. 10, p. 237 of 483).

Plaintiff returned on January 27, 2007 with complaints of profuse vaginal bleeding.  Her red

blood cell distribution width continued to exceed the normal levels but her mean corpuscular hemoglobin level was lower than normal. Plaintiff was diagnosed with multiple uterine fibroids (Docket No. 10, pp. 238, 240, 241, 242 of 483).

On March 27, 2007, Plaintiff presented with cardiac fluttering (Docket No. 10, p. 243 of 483). Results from the echocardiogram showed left bundle branch block (Docket No. 10, pp. 246-247 of 483).

Plaintiff presented with back pain on July 19, 2008. She was given mediation to relieve the pain (Docket No. 10, pp. 332-337 of 483).

At the hospital, attending physician Dr. Joseph D. Cooper, D. O., ordered diagnostic tests and on July 21, 2008, the magnetic resonance imaging of Plaintiff's lumbar spine was administered. The results showed very small left paracentral protrusion at L4-L5 which were best appreciated on the sagittal images (Docket No. 10, p. 330 of 483).

Also on July 21, 2008, Dr. Zakari evaluated Plaintiff's complaints of low back pain radiating to the left lower extremity. A treatment plan was employed which included nerve blocks to control the pain and aggressive physical therapy once the pain was alleviated (Docket No. 10, pp. 349-354 of 483).

Plaintiff presented to the hospital with acute coronary pain on July 29, 2007 (Docket No. 10, p. 249 of 483). The Doppler echocardiogram study showed a normal flow pattern (Docket No. 10, p. 256 of 483). Ultimately, the pain was attributed to the onset of a panic attack (Docket No. 10, p. 250 of 483). Plaintiff's glucose levels were elevated (Docket No. 10, p. 254 of 483).

Dr. Zakari addressed Plaintiff's two-month history of back pain on July 31, 2008. The treatment plan included another injection (Docket No. 10, pp. 366-369 of 483).

8

An X-ray of Plaintiff's lumbar spine taken on August 5, 2008, confirmed that Plaintiff had undergone an injection over the lower lumbar region. Dr. Adel Zakari planned to repeat the injection in three to four weeks and Plaintiff was instructed to continue present medical management (Docket No. 10, pp. 338-339 of 483).

On September 5, 2008, Plaintiff underwent an epidural steroid injection. On September 16, 2008, another injection was administered for pain management. On the following day, Plaintiff was treated for facial swelling that developed after undergoing a nerve block injection (Docket No. 319-329, 340-343; 344-348 of 483).

**B.**   **LAKEWOOD BIOMETRICS/LAKEWOOD LABORATORY/LAKEWOOD HOSPITAL**

On May 1, 2009, Plaintiff presented with abdominal pain on the left side. Through limited imaging, it was determined that there was no renal or urethral stones or findings of obstructive uropathy. Ultimately, Plaintiff was diagnosed with inflammation of the kidney and upper urinary tract (Docket No. 10, pp. 444-448; 466-475 of 483). Also on May 1, 2009, Plaintiff's medications prescribed to control blood pressure and blood sugar levels were reconciled (Docket No. 10, pp. 476-477 of 483).

On July 10, 2009, Plaintiff presented with spiked blood sugars and vague, right upper quadrant localized abdomen pain. There was no evidence of active pulmonary disease. The limited imaging through the lung base showed no infiltrates or effusions, no bowel obstructions and no secondary signs of acute appendicitis (Docket No. 10, pp. 436-443 of 483).

On October 31, 2009, Plaintiff was treated for inflammation of the throat, back and side. Diagnosed with a urinary tract infection (UTI) as well as an upper respiratory infection, an antibiotic was prescribed (Docket No. 10, pp. 424-435 of 483).

On May 22, 2010, Plaintiff presented with complaints of chest pain and dyspnea. Following

9

the chest pain protocol, several tests were conducted.  Notably, the results from the D-dimer duplex imaging of the right common femoral and tibial veins showed no evidence of venous thrombosis in the veins or pulmonary embolism.  In the left lower extremity, similar veins scanned showed similar findings.  Results from the comprehensive metabolic panel and other chemical testing showed abnormal blood sugars and urine cultures and a red blood cell distribution width that exceeded the normal reference range.  There was no evidence of acute cardiopulmonary process.  The clinical impression was that Plaintiff had pneumonia, a lower UTI and poorly controlled diabetes.  Upon clinical improvement, Plaintiff was released with instructions to take antibiotics and pain mediation (Docket No. 10, pp. 386-387, 389-403, 404-406; 408-423; 449-453 of 483).

   C.    DR. ROGELIO R. DELA ROCA, M. D., ENDOCRINOLOGIST.

   A urine specimen was collected on September 28, 2007.  The results showed abnormalities in the albumin excretion (Docket No. 10, p. 266 of 483).  The comprehensive metabolic panel showed an extremely elevated glucose level (Docket No. 10, p. 268 of 483).

   Dr. Dela Roca continued the prescription for Metformin on August 31, 2007 and gave Plaintiff an Accu-Chek meter so that she could monitor her blood sugars before each meal and at bedtime (Docket No. 10, p. 273 of 483).  After two missed appointments in September 2007, Dr. Dela Roca confirmed his suspicions that Plaintiff was noncompliant with the glucose monitoring; consequently, her diabetes was poorly controlled.  On October 1, 2007, Dr. Dela Roca continued the prescriptions for Metformin.  He added a prescription for Avapro®, a medication used to control blood pressure and treat kidney problems caused by diabetes (Docket No. 10, p. 271 of 483; PHYSICIAN'S DESK REFERENCE, 2006 WL 367851(Thomson PDR 2006)).

   On November 14, 2007, Dr. Dela Roca increased the prescription for Metformin and advised her that diarrhea was a side effect.  He also prescribed Byetta and advised that a side effect of it was

nausea (Docket No. 10, p. 270 of 483).

After cancelling two scheduled appointments in March 2008, Dr. Dela Roca noted on April 22, 2008, that Plaintiff had well controlled non-insulin dependent diabetes mellitus (NIDDM).  He continued her medications for NIDDM and prescribed additional medication suitable to treat acute bronchitis (Docket No. 10, p. 308 of 483).

On July 16, 2008, Dr. Dela Roca diagnosed Plaintiff with a herniated disc at L4-L5, L5-S1. Treatment included a prescription for a pain reliever and muscle relaxant.  He also advised Plaintiff that the prescription for Glyburide could cause hypoglycemia (Docket No. 10, pp. 307, 383 of 483).

Dr. Dela Roca ordered a magnetic resonance imaging of the lumbar spine on July 21, 2008. The results showed normal alignment of the lumbar vertebral bodies but there was mild loss of intervertebral disk height and signal.  At L4-L5, there was a very small left paracentral protrusion that was causing mild narrowing of the spinal canal.  The remainder of the study was normal (Docket No. 10, p. 305 of 483).

On September 10, 2008, Dr. Dela Roca reviewed the laboratory work completed on September 2, 2008.  Plaintiff's cholesterol level was elevated and her renal panel showed a creatinine level that warranted a lipid/liver panel and urine screen (Docket No. 10, pp. 377-378 of 473).

On September 16, 2008, Plaintiff underwent a steroid injection at the levels of Left L4 and L5 (Docket No. 10, pp. 373-376 of 483).

On November 17, 2008, Dr. Dela Rosa treated Plaintiff for sinusitis/bronchitis (Docket No. 10, p. 372 of 483).

On December 17, 2008, Dr. Dela Rosa prescribed Xanax and ordered that Plaintiff return after it was consumed.  He also ordered a 24-hour Holter monitor (Docket No. 10, p. 371 of 483).

11

On July 24, 2009, Dr. Dela Rosa adjusted Plaintiff's prescription for Lasix to assist with water retention and edema (Docket No. 10, p. 370 of 483).

Plaintiff sought Dr. Dela Rosa's opinion as to whether she could withstand the hysterectomy procedure.  On March 9, 2010 and June 29, 2010, Dr. Dela Rosa conducted follow up care and reiterated that Plaintiff had undergone a catheteriziation and that she was subject to risk factors such as smoking and diabetes (Docket No. 10, pp. 482-483 of 483).

###### D.      DR. ALI N. SHAIKH, M. D., AN INTERNIST.

A basic metabolic panel was conducted at the Cleveland Clinic on June 10, 2010.  Plaintiff's glucose level was elevated but her sodium and chloride levels were lower than normal.  Plaintiff's cholesterol level exceeded the normal range which is less than 200 and her hemoglobin A1C levels were diagnostic of diabetes (Docket No. 10, pp. 479-481 of 483).

###### E.      PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT COMPLETED BY DR. WILLIAM BOLZ, M. D.

Based on all of the evidence as well as his reasoned judgment, Dr. Bolz determined that Plaintiff could:

1.      Occasionally lift and/or carry fifty pounds;
2.      Frequently lift and/or carry twenty-five pounds;
3.      Stand and/or walk about six hours in an eight-hour workday;
4.      Sit with normal breaks for a total of about six hours in an eight-hour workday; and
5.      Push and/or pull on an unlimited basis.

(Docket No. 10, p. 312 of 483).

Dr. Bolz determined that the postural limitations were limited to occasionally stooping and crouching.  Plaintiff should never climb using a ladder, rope or scaffolds (Docket No. 10, p. 312 of 483).  There were no communicative, environmental, manipulative or visual limitations (Docket No. 10, pp. 313-315 of 483).  Dr. Bolz opined that Plaintiff's impairments did not meet or equal the

listing and that Plaintiff's medically determinable allegations were partially credible (Docket No. 10, p. 316 of 483).

### 2.   IMPAIRMENTS BASED ON MENTAL EXAMINATION.

### A.   RICHARD N. DAVIS, CLINICAL PSYCHOLOGIST.

The Bureau of Disability Determination (BDD) employed Mr. Davis to conduct an adult clinical interview.  On April 17, 2008, Mr. Davis conducted such interview during which no diagnostic tests were administered and there is no indication that Mr. Davis reviewed Plaintiff's medical records.

During the interview, Plaintiff described her childhood as "average enough."  She completed nine years of formal education.  Based on his observation, Mr. Davis concluded that Plaintiff presented with a depressed affect, intellectual limitations and she was restricted in her daily activities.  Plaintiff was not coping well with the stressors of her life and she did not seem capable of handling employment and the stressors and pressures of home.  Plaintiff did not present with any physical problems that would interfere with her lifting, carrying or handling heavy objects unless it would exacerbate her blood pressure and she did present with limitations in her ability to think logically, use common sense and judgment.  The final diagnosis:

| | |
|---|---|
| Axis I: | Major depression, recurrent, severe without psychotic features |
| Axis II: | Borderline intellectual functioning. |
| Axis III: | Diabetes and hypertension. |
| Axis IV: | Psycho-social stressors to the extent that she is overwhelmed as to how one goes about "dealing effective with life". |
| Axis V: | A global assessment of functioning score or a comprehensive diagnosis that considers the complete picture of the entire scope of psychological, social and occupational functioning on a hypothetical continuum.  Here, Dr. Davis attributed a score of 55 which denotes the presence of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers) (Docket No. 10, pp. 279-283 of 488; www.psyweb.com/DSM_Iv/jsp/Axis_V.jsp). |

**B.      PSYCHIATRIC REVIEW TECHNIQUE COMPLETED BY DR. MELANIE BERGSTEN, PH. D., A PSYCHOLOGIST.**

Having reviewed the medical record as a whole, Dr. Bergsten made the following assessment of Plaintiff's mental health from December 31, 2004 through May 22, 2008.  She diagnosed Plaintiff with major depression, severe without psychotic features and borderline intellectual functioning. The degree of functional limitations resulting from these psychological features was:

| | | |
|---|---|---|
| 1. | Restriction of Activities of Daily Living | Mild limitations. |
| 2. | Difficulties in Maintaining Social Functioning | Moderate limitations |
| 3. | Difficulties in Maintaining Concentration Persistence or Pace | Moderate limitations. |
| 4. | Episodes of Decompensation, each of Extended Duration | None. |

(Docket No. 10, pp. 286, 289, 290, 296 of 483).

**C.      MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT COMPLETED BY DR. BERGSTEN, PH.D.**

On May 22, 2008, she found that Plaintiff had moderate limitations in the following domains:

1. The ability to understand and remember detailed instructions.
2. The ability to carry out detailed instructions.
3. The ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.
4. The ability to complete a normal workday and normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable and length of rest periods.
5. The ability to interact appropriately with the general public.

Dr. Bergsten found Plaintiff's allegations partially credible, as she now reports very severe symptoms but she said that she forgot to mention them when completing her initial application. Weight was attributed to the opinions of the psychological examiner (Mr. Davis) with the exception of marked impairment in Plaintiff's ability to deal with the stressors and pressures of work as a degree of impairment as this conclusion is not supported by objective evidence (Docket No. 10, pp.

14

300, 301).

On September 1, 2008, Dr. Catherine Flynn, Psy. D., conducted a case analysis and affirmed Dr. Bergsten's opinions of May 22, 2008 (Docket No. 10, p. 310 of 483).

### IV. STANDARD FOR ADMINISTRATIVE REVIEW.

#### A. DISABILITY DEFINED.

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920 respectively.  DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U. S. C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).  A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *Key v. Callahan*, 109 F. 3d 270, 274 (6th Cir. 1997).

#### B. SOCIAL SECURITY REGULATIONS.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical

or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6ᵗʰ Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

## V. THE ALJ'S FINDINGS.

Having considered the standard of disability, medical evidence and testimony of Plaintiff and the VE, the ALJ found that:

(1)    Plaintiff met the insured status requirements of the Act through September 30, 2008. Plaintiff had not engaged in substantial gainful activity since December 31, 2004, the alleged onset date.

(2)    Plaintiff had the following severe impairments which were severe either singly or in combination:  obesity, back pain and affective disorder.  However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

(3)    After careful consideration of the entire record, Plaintiff had the residual functional capacity to perform medium work except that she must never climb ladders or scaffolds, and no more than occasionally stooping, crouching or crawling; the work must be limited to simple tasks with easily definable changes and the work must be low stress, defined as involving no more than occasional changes in the work setting.

(4)    Plaintiff had past relevant work.

(5)    Plaintiff was capable of performing her past relevant work as a hand packager.  This work does not require the performance of work-related activities precluded by Plaintiff's residual

functional capacity.

(6)     Plaintiff was not under a disability as defined in the Act from December 31, 2004 through the date of this decision on August 11, 2010.

(Docket No. 10, pp. 15-22 of 483).

## VI. THIS COURT'S JURISDICTION, SCOPE AND STANDARD OF REVIEW.

A district court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). This Court has jurisdiction over the final ruling of the district court pursuant to 28 U.S.C. § 1291, 42 U.S.C. § 405(g), and 42 U.S.C. § 1383(c)(3).

Congress has provided a limited scope of review for Social Security administrative decisions under 42 U.S.C. § 405(g). The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. *McClanahan v. Commissioner of Social* Security, 474 F.3d 830, 833 (6th Cir. 2006) (*citing* 42 U. S. C. § 405(g)). The court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6th Cir. 1967)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . *Id.* This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. ANALYSIS.

17

### A. THE POSITION OF THE PARTIES.

Plaintiff challenges the ALJ decision to discount Mr. Davis' opinions because it is based on subjective evidence when in reality, Mr. Davis was the only source that considered Plaintiff's overall mental status and determined that Plaintiff was not coping well with life and thus, there was serious doubt as to whether she could work at this or any time. Stated differently, the ALJ failed to consider that Mr. Davis concluded that Plaintiff was disabled. Plaintiff argues that because of this erroneous analysis, the ALJ's residual functional capacity fails to consider the severity of Plaintiff's mental health impairments and the ALJ's credibility finding is faulty.

Defendant counters with arguments that:

(1)     The ALJ properly gave Mr. Davis's opinion only little weight because it was internally inconsistent and not consistent with the evidence as a whole.

(2)     Relying on Sixth Circuit case law, the ALJ may reject a medical opinion that is inconsistent with the record and formed solely from the claimant's reporting of her symptoms and conditions.

(3)     Given that Plaintiff never sought mental health treatment, yet was assessed with a marked limitation by Mr. Davis, who also relied heavily on Plaintiff's own statements in crafting his opinion, which was internally inconsistent, the ALJ properly declined to afford Mr. Davis' opinions any weight.

### B. THE REGULATIONS.

Generally, more weight is given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *Broyles v. Astrue*, 2012 WL 1854627, *7 (S.D.Ohio,2012) (*See* 20 C.F.R. § 404.1527(d)(1)). The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [SOCIAL SECURITY] ACT." *Id.* (*citing* SOCIAL SECURITY RULING (SSR) 96–6p, 1996 WL 374180 at *2). Yet the Regulations do not permit an ALJ to automatically accept, reject or ignore the opinions of a non-treating medical source. *Id.* (*citing* SSR at *2–*3). The Regulations explain, "In deciding whether you are disabled, we will always consider

18

the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). *Id.* To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *Id.* (*See* 20 C.F.R. § 404.1572(f); *see also* SSR 96–6p at *2–*3).

When the ALJ examines that the opinions of State agency psychological consultants or other program sources, the opinions can be given weight only insofar as they are supported by evidence in the case record, considering such factors as supportability of the opinion in evidence including any evidence received at the ALJ and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. POLICY INTERPRETATION RULING TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE, 1996 WL 374180, *2, SSR 96-6p (July 2, 1996). Unless the treating source's opinion is given controlling weight, the ALJ must explain in the decision the weight given to the opinions of State agency medical or psychological consultants just as the ALJ must do for any opinions from treating sources. 20 C. F. R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii) (Thomson Reuters 2012).

Under 20 C. F. R. §§ 404.1527(d), 416.927(d), medical source opinions on issues reserved to the Commissioner because they are dispositive of a case; i.e., that would direct the determination or decision of disability, include the following:

(1)     Opinions that you are disabled. We are responsible for making the determination or

decision about whether you meet the statutory definition of disability.  In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled.  A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2)  Other opinions on issues reserved to the Commissioner.  We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s).  Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§ 404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

(3)  We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section.

C.  APPLICATION OF THE REGULATIONS TO PLAINTIFF'S CLAIMS.

In compliance with the regulations, the ALJ acknowledged that the opinions of Mr. Davis were the result of a consultative examination made by a cooperating state agency.  Accordingly, the ALJ considered the evidence provided by Mr. Davis as opinion evidence from a non-examining medical source.  The ALJ also acknowledged that she was not bound by Mr. Davis' opinions on Plaintiff's eligibility for disability or Plaintiff's residual functional capacity.  She did, however, consider this opinion evidence under 20 C. F. R. §§ 404.1527(a), 416.927(a).

Contrary to Plaintiff's assertion, Mr. Davis was not in the best position to provide a picture of Plaintiff's mental impairment or her employability.  After all, during the one-time consultative examination requested by BDD, Plaintiff controlled the source and amount of information given to Mr. Davis.  Mr. Davis then channeled her recitations and his observations into the diagnoses paradigm.  Thereafter, Mr. Davis took liberties, drawing conclusions based solely on what was said and his perception of Plaintiff's feeling (Docket No. 10, pp. 282-283 of 483).  In either case, there were no medical signs or laboratory findings to support Plaintiff's assertions.  Mr. Davis' opinions were based solely on Plaintiff's assertions which at one point he even considered questionable

20

(Docket No. 10, p. 280 of 483). Ultimately, he failed to bring to the attention of the Commissioner objective evidence that provided support for giving more weight to his opinions.

The ALJ did all that she was required to do under the regulations with respect to consideration of state agency opinions, clearly dismissing any conclusions Mr. Davis may have made about her inability to work now or at any time. Under the regulations, this conclusion was outside the boundaries of the regulatory provisions which leave the determination of disability within the Commissioner's jurisdiction. Similarly, the ALJ discounted Mr. Davis' conclusions about Plaintiff's work-related mental abilities in residual functional capacity. They too, were based on Plaintiff's self reporting about her level of education and the number of applications made for benefits. The ALJ discounted Plaintiff's reports as there was no objective evidence of her educational background or learning disabilities (Docket No. 10, pp. 19, 20 of 483). Here, too, the ALJ's determination that Plaintiff had the residual functional capacity for medium work was within the province of conclusions reserved to the Commissioner.

Finally, Plaintiff stated that Mr. Davis was in the best position to consider her credibility. Plaintiff suggests that any determination by Mr. Davis about Plaintiff's credibility should be given substantial deference.

It is of course for the ALJ to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 247 (6th Cir.2007) (*citing Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir.1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir.1990); *Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 538 (6th Cir.1981)). The ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Id.* (*citing* POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN

21

INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at * 4, SSR 96-7p, (July 2, 1996)).  Rather, such determinations must find support in the record.  *Id.*  Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record."  *Id.*

SSR 96-7p also requires the ALJ explain the credibility determinations in his or her decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.* (footnote omitted).  In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence.  *Id.*

While all of the evidence in this case was scrutinized, the various pieces of information contained in the record tended to show that some inconsistencies existed in the treatment employed and Plaintiff's evaluation of her symptoms.  However, this was not totally defeating to the assessment of Plaintiff's credibility.  The credibility determination was based, in part, on Mr. Davis' observations but additionally, Plaintiff's own complaints of symptoms and medical signs and lab findings that tended to support Mr. Davis' conclusion as to the symptoms.  Ironically, the ALJ concurred with Mr. Davis that her symptoms caused at least one moderate limitation in function and could reasonably be expected to result in depression.  In that regard, the ALJ adopted Plaintiff's assessment of her symptoms of depression.  The ALJ did not concur with Mr. Davis that the impairment was of the severity that he suggested (Docket No. 10, pp. 15-16, 18 of 483).

Based upon a finding that the ALJ followed the rules for assessing credibility, the Magistrate does  not recommend reversing the ALJ's determination of credibility as the ALJ considered Mr.

Davis' opinions in assessing the severity of impairments and its affect upon Plaintiff's credibility.

## VIII. CONCLUSION.

For the foregoing reasons, the Magistrate recommends that the Court affirm the Commissioner's decision denying SSI and DIB benefits and terminate the referral to the undersigned Magistrate Judge.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:    January 11, 2013

## IX. NOTICE FOR REVIEW.

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's

23

Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.